Case No. _____

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

BUCKEYE POWER, INC. and
OHIO VALLEY ELECTRIC CORPORATION,

*Petitioner*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and
MICHAEL S. REGAN, Administrator, United States Environmental Protection
Agency

*Respondents*

_____

Petition for Review of a Final Agency Action of the
United States Environmental Protection Agency

_____

## MOTION OF BUCKEYE POWER, INC. and OHIO VALLEY ELECTRIC
## CORPORATION FOR A STAY PENDING REVIEW

_____

Michael E. Born
Cheri A. Budzynski
Krystina E. Garabis
Shumaker, Loop & Kendrick, LLP
Huntington Center
41 South High Street
Suite 2400
Columbus, OH 43215
(614) 463-9441
mborn@shumaker.com
cbudzynski@shumaker.com
kgarabis@shumaker.com

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. 2

TABLE OF AUTHORITIES ............................................................................. 3

INTRODUCTION ........................................................................................... 6

BACKGROUND ............................................................................................. 7

LEGAL STANDARD .................................................................................... 11

A. Considering the numerous flaws in the Final Rule, the Ohio Utilities are likely to succeed in establishing that the FIP is arbitrary, capricious, and unlawful. ....................... 12

   i.   With the removal of key states, the FIP is based on air quality improvements that cannot be met. ........................................................................ 14

   ii.   Forcing states to participate in a fractured trading program is the result of arbitrary and capricious rulemaking. ................................................ 15

B.   The Petitioners will suffer irreparable harm. ....................................... 16

C.   Other interested parties would not suffer harm by temporarily staying the rule. ..... 18

D.   A stay is in the public interest. ............................................................ 19

CONCLUSION ............................................................................................. 19

CERTIFICATE OF COMPLIANCE ............................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Garza v. Hargan.,*
874 F.3d 735 (D.C. Cir. 2017) ............................................................................ 7

*EPA v. Homer City Generation, L.P.,*
572 U.S. 489 (2014) ...................................................................................... 7, 8

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) .......................................................................................... 11

*Bowman Transp., Inc. v. Ark. - Best Freight Sys., Inc.,*
419 U.S. 281 (1974) ........................................................................................ 11

*Nken v. Holder.,*
556 U.S. 418 (2009) ........................................................................................ 11

*Texas, et al., v. EPA.,*
No. 23-60069 (5th Cir. 2023) ...................................................................... 9,12

*Arkansas v. EPA.,*
No. 23-1320 (8th Cir. 2023) ........................................................................ 9,12

*Missouri v. EPA.,*
No. 23-1719 (8th Cir. 2023) ........................................................................ 9,12

*Allete, Inc. v. EPA.,*
No. 23-1776 (8th Cir. 2023) ............................................................................ 9

*Utah, et al., v. EPA.,*
No. 23-9521 (10th Cir. 2023) .......................................................................... 9

## Statutes

42 U.S.C. § 7410 ......................................................................................... 7, 8

42 U.S.C. § 7409 ............................................................................................. 7

**Regulations**

Ozone National Ambient Air Quality Standards,
    88 Fed. Reg. 36654 (2015).............................................................. 6

National Ambient Air Quality Standard for Ozone
    80 Fed. Reg. 65292, 65301 (2015)................................................. 8

Air Plan Disapproval; Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin
    87 FR 9838 (Feb. 22, 2022)........................................................... 9

Air Plan Disapproval; Region 5 Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards
    87 FR 9838 (Feb. 22, 2022)........................................................... 9

Air Plan Disapproval; Maryland; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standard
    87 FR 9463 (Feb. 22, 2022)........................................................... 9

Air Plan Disapproval; New York and New Jersey; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards
    87 FR 9484 (Feb. 22, 2022)........................................................... 9

Air Plan Disapproval; New York and New Jersey; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards
    87 FR 9498 (Feb. 22, 2022)........................................................... 9

Air Plan Disapproval; West Virginia; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standard
    87 FR 9516 (Feb. 22, 2022)........................................................... 9

Air Plan Disapproval; Missouri Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards
    87 FR 9533 (Feb. 22, 2022)........................................................... 9

Air Plan Disapproval; AL, MS, TN; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards
    87 FR 9545 (Feb. 22, 2022)........................................................... 9

Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate
Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality
Standards
    87 FR 9798 (Feb. 22, 2022)........................................................................ 9

Emission Reductions by FIP for Ohio
88 Fed. Reg. 36719,36749, 36741, 36677............................................................ 13

Emission Allowance
88 Fed. Reg. 36657........................................................................................... 14, 15

FIP for Ohio "Enhancements" in Trade Program
88 Fed Reg. at 36762-70.................................................................................... 15

**Other Authorities**

Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality
Standards (Jul. 31, 2023)
    88 Fed Reg. 49295.................................................. 6, 7, 8, 10, 14, 15, 16, 17, 18, 19

Memo. from Joseph Goffman, *Notice of Forthcoming EPA Action to Address Additional
Judicial Stay Orders* (Aug. 2, 2023)...........................................................................10

## INTRODUCTION

Against the backdrop of the Clean Air Act ("CAA"), the United States Environmental Protection Agency ("EPA") intends to circumvent its statutory authority and force Petitioners, Ohio Valley Electric Corporation ("OVEC") and Buckeye Power, Inc. ("Buckeye") (collectively referred to as "the Ohio Utilities"), to comply with a regulation premised on arbitrary and capricious rulemaking.  On June 5, 2023, EPA promulgated the Federal "Good Neighbor" Implementation Plan ("FIP") for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 36654 (June 5, 2023) ("Good Neighbor Plan," or "Final Rule").  In its current state, the Final Rule shows EPA's lack of awareness of its own regulations.  EPA promulgated the Good Neighbor Plan without consideration of the practical impact that the various judicial stays associated with State Implementation Plan ("SIP") disapprovals have on the legal and technical basis of the Good Neighbor Plan.  As is, the FIP does not serve its intended purpose.

Without immediate assistance from this Court, OVEC and Buckeye will suffer irreparable harm.  The Final Rule will require the Ohio Utilities to spend millions of dollars to make immediate facility changes to comply.  The Final Rule will also force the Ohio Utilities to partake in a fundamentally flawed trading program, which will require major modifications to current business practices.  These factors may seem minor, but the reality of this rulemaking is a threat to the lifespan of the Ohio Utilities and the reliability of the grid for Ohioans.

EPA will not be harmed by a stay of the FIP and, instead, may benefit from additional time to determine how to regulate the Ohio Utilities considering the disapproval of Kentucky's SIP is likely to be found arbitrary and capricious. For these reasons, and those discussed in further detail below, this Court should issue a stay of the implementation of the Final Rule against the Ohio Utilities.

The Ohio Utilities also seek an administrative stay pending the Court's ruling on this motion. This would give the Court "sufficient opportunity to consider" the Ohio Utilities' request. *Garza v. Hargan*, No. 17-5236, 2017 WL 4707112, at *1 (D.C. Cir. Oct. 19, 2017) (per curiam).

## BACKGROUND

### I.  EPA's authority to promulgate the Good Neighbor Plan.

A core principle of the Clean Air Act ("CAA") is "cooperative federalism." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 511 n.14 (2014) ("*EME Homer II*"). The Good Neighbor Provision of the CAA prohibits in-state sources from emitting air pollutants in amounts that will contribute significantly to the nonattainment of downwind states. 42 USC § 7410(a)(2)(D)(i). To regulate these emissions, the CAA provides EPA with the authority to establish national ambient air quality standards ("NAAQS"). § 7409. States are then responsible for determining how to meet those standards by drafting a state implementation plan ("SIP"). § 7410(a). Before a SIP can be functional, EPA must approve the state's plan. § 7410(k)(3).

The approval or disapproval of a SIP is the legal prerequisite to the promulgation

of a federal implementation plan ("FIP"). If approved, the state plan regulates that geographic area. It is *only* upon the disapproval of a SIP that EPA has an obligation to issue a FIP. *Id.* at § 7410(c)(1). EPA's authority under a FIP is limited to providing "adequate provisions" necessary to eliminate emissions from a State that will "contribute significantly to nonattainment" in another state. § 7410(a)(2)(D)(i)(I).

Historically, when developing the FIP, EPA employs a two-step approach to determine what it means to "contribute significantly." First, EPA identifies the states exempt from regulation by excluding "any upwind State that contributed less than one percent to any downwind" location where EPA is measuring air quality. *EME Homer II*, 572 U.S. at 500. The remaining States are subject to a second inquiry, the "control" analysis. *Id.* at 501. At this stage, the Agency generates a cost-effective allocation of emission reductions among the upwind states "screened in." *Id.*

## II.   Ohio's SIP disapproval.

In October 2015, EPA revised the NAAQS for ozone downward from 75 parts per billion (ppb) to "a level within a range from 65 to 70 ppb." *National Ambient Air Quality Standard for Ozone,* 80 Fed. Reg. 65292, 65301 (Oct. 26, 2015). The promulgation of the 2015 NAAQs triggered the states' obligation to update their SIPs to satisfy the revised "good neighbor" provision of the Act. 42 U.S.C. § 7410(a)(1), (2)(D).

Ohio submitted their ozone SIP to EPA on September 28, 2018. EPA disapproved Ohio's SIP on February 22, 2023, in the same publication as Illinois, Indiana, Michigan, Minnesota, and Wisconsin and on the same day as the denials of

Maryland, New Jersey, New York, **Kentucky**, West Virginia, Missouri, Mississippi, Arkansas, Louisiana, Oklahoma, and Texas.[1]

A number of these states challenged the disapproval of their individual SIP, including Kentucky. In ten of those States, the court has stayed the SIP disapproval based on the conclusion that EPA's disapproval was likely arbitrary and capricious and/or unlawful.[2] This again, includes Kentucky. With a FIP developed for 23 states, the judicial stays in ten states has disrupted the legal and factual foundation for the Final

---

[1] *Air Plan Disapproval; Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin; Air Plan Disapproval; Region 5 Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 87 FR 9838 (Feb. 22, 2022); *Air Plan Disapproval; Maryland; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standard*, 87 FR 9463 (Feb. 22, 2022); *Air Plan Disapproval; New York and New Jersey; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 87 FR 9484 (Feb. 22, 2022); *Air Plan Disapproval; Kentucky; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 87 FR 9498 (Feb. 22, 2022); *Air Plan Disapproval; West Virginia; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standard,* 87 FR 9516 (Feb. 22, 2022); *Air Plan Disapproval; Missouri Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards,* 87 FR 9533 (Feb. 22, 2022); *Air Plan Disapproval; AL, MS, TN; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards,* 87 FR 9545 (Feb. 22, 2022); *Air Plan Disapproval; Arkansas, Louisiana, Oklahoma, and Texas; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards,* 87 FR 9798 (Feb. 22, 2022).

[2] *Texas et al., v. EPA*, No. 23-60069 (5th Cir. May 1, 2023) (staying the disapproval of Texas, Mississippi, and Louisiana's SIP); *Arkansas v. EPA*, No. 23-1320 (8th Cir. May 25, 2023) (staying the disapproval of Arkansas's SIP disapproval); *Missouri v. EPA*, No. 23-1719 (8th Cir. May 26, 2023) (staying the disapproval of Missouri's SIP); *Allete, Inc. v. EPA*, No. 23-1776, Order (8th Cir. July 5, 2023) (staying the disapproval of Minnesota's SIP); *Kentucky v. EPA*, No. 23-3216, Doc. 89, Order (6th Cir. July 25, 2023) (staying the disapproval of Kentucky's SIP), *Utah, et al., v. EPA*, No. 23-9521, Doc. 010110895101, Order (10th Cir. July 27, 2023) (staying the disapproval of Oklahoma and Utah's SIP).

Rule.

In light of these judicially imposed stays, EPA issued a proposed rule, set to be final on August 4, 2023, that stays the application of the FIP requirements for Arkansas, **Kentucky**, Louisiana, Mississippi, Missouri, and Texas. *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Response to Judicial Stays of SIP Disapproval Action for Certain States*, 88 Fed Reg 49295 (July 31, 2023) (referred to as the "Administrative Stay of the FIP"). Notably, the Administrative Stay did not include Nevada, Utah, Oklahoma, and Minnesota. As a result, on August 2, 2023, EPA announced its intent to extend the Administrative Stay of the FIP to these additional states. *See* Memo. from Joseph Goffman, *Notice of Forthcoming EPA Action to Address Additional Judicial Stay Orders* (Aug. 2, 2023), https://www.epa.gov/system/files/documents/2023-08/23-02403-OAR-OAP%20_Memo%20from%20J.%20Goffman%20re%20Response%20to%20Further%20Stay%20Orders%20_JG%20Signed%20%282%29.pdf. EPA has yet to respond with its intended regulation of the states, like Ohio, still regulated by a FIP that will soon be missing almost half of its original population.

Ohio did not appeal its SIP disapproval and is not subject to a judicial stay of its SIP disapproval, but with this Court's stay of EPA's disapproval of Kentucky's SIP, the Ohio Utilities are in a particularly precarious position. *Commonwealth of Kentucky v. EPA*, Case No. 23-3216/3225 (July 25, 2023) (Attached as Exhibit A). As a result, the Ohio Utilities are placed at odds with the emission sources in Kentucky. This contravenes

the purpose of the FIP and destabilizes the controls set by the FIP.  Therefore, the Ohio Utilities seek a stay from this Court to prevent irreparable harm to the Ohio Utilities and Ohioans for a regulation that no longer serves its intended purpose.

## LEGAL STANDARD

### I.    Arbitrary and Capricious Standard

An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  This requires a court to assess "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.* (quoting *Bowman Transp., Inc. v. Ark.- Best Freight Sys., Inc.,* 419 U.S. 281, 285 (1974)).

### II.    Motion for Stay Standard

Courts evaluate four factors when assessing whether a litigant is entitled to a stay, including whether: (1) the party seeking a stay "has made a strong showing" that it is "likely to succeed on the merits;" (2) the party "will be irreparably injured absent a stay;" (3) whether a stay will "substantially injure" other parties; and (4) a stay is in "the public interest."  *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted).  The first two factors are "the most critical."  *Id.*  For the purpose of administrative

appeals, showing likelihood of success on the merits is equivalent to showing that rulemaking under review is arbitrary and capricious.

## ARGUMENT

Each factor supports staying EPA's promulgation of the FIP against Ohio. In terms of overall effects, burden, and feasibility, the majority of the Final Rule has already been stayed. EPA's failure to modify the FIP after various judicial stays obviated the technical and legal basis for EPA's implementation of the FIP. Particularly, EPA ignored that the population regulated by the FIP no longer exists. Buckeye and OVEC will be forced into making radical compliance decisions and incur massive costs for a FIP that no longer serves its purpose. Moreover, EPA will not be harmed by a stay of the FIP, but, if anything, will benefit from additional time to determine how to regulate Ohio now that the disapproval of Kentucky's SIP has been stayed.

**A.    Considering the numerous flaws in the Final Rule, the Ohio Utilities are likely to succeed in establishing that the FIP is arbitrary, capricious, and unlawful.**

Even before the publication of the Final Rule, judicial stays in the Fifth, Eighth, and Ninth Circuit Courts eviscerated the legal authority underlying the FIP by staying the disapproval of various states' SIPs.[3] Those states, by virtue of the judicial stays, no longer had a final SIP denial. Yet, EPA promulgated a FIP intended to regulate states

---

[3] *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023); *Arkansas v. EPA*, No. 23-1320 (8th Cir. May 25, 2023); *Missouri v. EPA*, No. 23-1719 (8th Cir. May 26, 2023).

that EPA **knew would no longer be subject to the FIP**.

Instead, and only recently, on July 31, 2023, EPA issued an Administrative Stay of the FIP, staying application of the FIP requirements for Arkansas, Kentucky, Louisiana, Mississippi, Missouri, and Texas.[4]  Notably, this rule does not include Utah, Oklahoma, Nevada, and Minnesota who have judicial stays in place of their SIP disapprovals.  EPA stated its intent to issue a rule in response to the additional stays in place, but this response does not resolve that the FIP will not regulate the states that it was developed to regulate.

While Ohio has not challenged its SIP disapproval, the Ohio Utilities relied on EPA's statutory obligation to promulgate a FIP developed to regulate **Ohio's** emissions based on **Ohio's** contribution to the attainment of downwind states.  At a minimum, EPA acted arbitrarily and capriciously by promulgating a FIP for Ohio that relies on the inclusion of states that do not have a final SIP disapproval.  But, additionally, the FIP was promulgated with a now erroneous technical basis for the intended emission reduction program.  Moreover, EPA's promulgation of the Final Rule is a direct reflection of EPA's failure to consider the disintegrated market that is necessary for the intended trading program.

---

[4] *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards; Response to Judicial Stays of SIP Disapproval Action for Certain States*, 88 Fed. Reg. 49295 (July 31, 2023).

### i. With the removal of key states, the FIP is based on air quality improvements that cannot be met.

The emission reductions set by the FIP for Ohio are based, in part, "on the combined effect of the entire program *across all linked upwind states*." 88 Fed. Reg. at 36719, 36749 (emphasis added). EPA's model depended on "a uniform level of emissions reduction that the covered sources in the linked upwind states can achieve." *Id.* at 36676. EPA promulgated a control strategy for emissions that was intended to be "an efficient and equitable solution to the problem of allocating upwind-state responsibility for the elimination of significant contribution," again, when applied **"on a uniform basis across all linked upwind states."** *Id.* at 36741 (emphasis added).

By its own terms, the underlying model was based on a "uniform" imposition of emissions controls to all the States concerned, including the now-exempted ones. *Id.* at 36719, 36677. After the EPA exempted six states from the FIP, that connection between the modelling and the conclusion dissolved.

Based on EPA's assessment of the emission reductions anticipated from the Final Rule, a significant portion of all anticipated power plant emission reductions (and the associated emissions allowances in the multi-state trading program) are now excluded from the FIP. Exhibit A, Good Neighbor Plan for 2015 Ozone NAAQS Maps for power plants and industrial plants.

Ultimately, the Final Rule relied on the monitoring from 23 states to determine the FIP limitations. By virtue of the judicial stays currently in place, the FIP made for

23 states will only regulate 16 states, which renders it irreparably flawed.

### ii. Forcing states to participate in a fractured trading program is the result of arbitrary and capricious rulemaking.

The Good Neighbor Plan requires the Ohio Facilities to participate in a broken cap and trade program that cannot feasibly coexist with the emission allocation restrictions incorporated into the Final Rule. And, with the removal of key states, like Kentucky, the information used for calibration and allowance conversion is no longer applicable.

Under the Final Rule, all of the states in the emission allowance markets would be considered a single group for trading purposes. 88 Fed. Reg. at 36657. However, in response to the court-issued stays, EPA fractured the marketplace and eliminated the opportunity to trade across groups by issuing an Administrative Stay of the FIP to some states. As a result, EPA removed a large portion of the market and limited the availability of allowances.

The FIP imposes "enhancements" in its trade program that ultimately reduces flexibility and create costly compliance challenges. 88 Fed. Reg. at at 36762–70. Specifically, the FIP shrinks the tradeable allowance bank by removing "surplus … allowances" that "diminish[] the intended stringency" of the program. *Id.* at 36767.

To overcome the restrictions on "banking" allocations, the Final Rule provides for a larger market by considering all the regulated states as a single group for trading purposes. *Id.* at 36657. As explained by EPA, "[b]roader marketplaces generally

provide greater market liquidity and therefore make trading programs better at providing these advantages." *Id.* at 36766, n.295. With the judicial stays in place, however, "nearly half of the total allowance pool" will be "unavailable." Decl. of Michael Brown at ¶ 14 (Attached as Exhibit B). Functionally, this creates a smaller market and a diminished capacity for a trading program necessary for "providing continuous emissions reduction incentives, facilitating compliance cost minimization, and supporting operational flexibility." 88 Fed. Reg. at 36766, n.295.

Even if the FIP were lawful before the EPA issued its interim rule, the FIP is now arbitrary and capricious. The legal basis for the Plan has fundamentally changed and the Final Rule lacked a legal and factual basis even prior to implementation. Without the legal or technical basis for promulgating a FIP, EPA's rulemaking is arbitrary and capricious. For these reasons, and others, the Ohio Utilities are likely to succeed on the merits in court challenges.

### B.     The Petitioners will suffer irreparable harm.

The Ohio Utilities will suffer irreparable harm if the Good Neighbor Plan is not stayed. Once the FIP becomes active, the Ohio Utilities will be subject to overbearing regulations that will impose radical compliance deadlines in a system fundamentally broken. The FIP cannot serve its purpose in its current state until there is a judicial decision regarding the status of the challenged SIPs. In the meantime, without a stay, the Ohio Utilities, like Kentucky successfully argued, will suffer "irreparable injury due to unrecoverable compliance costs." *Commonwealth of Kentucky v. EPA*, Case No. 23-

3216/3225 (July 25, 2023). And, to have any hope of compliance by the proposed deadlines, the Utilities would need to begin the process to modify facilities to meet the FIP's strict requirements *now*.

Requiring Buckeye and OVEC to comply with a rule that lacks the legal prerequisites for promulgation would result in major modifications to facilities to meet an expedited timeline. Besides imposing costs on the Buckeye and OVEC, and their customers, the FIP also threatens the reliability of the power grid and forces the Ohio Utilities to participate in a failing trading program.

The FIP requires a 50% reduction from 2021 ozone season NOx by 2027. Decl. of Michael Brown at ¶ 12. Thus, the FIP "diminishes the fossil fuel generation capacity" by "ratcheting down" the NOx allowance allocations to Ohio, which results in fewer allocations for Buckeye and OVEC. *Id.* at ¶ 14. At the same time, the Final Rule implements a trading program with dramatic restrictions on the ability to "bank" unused NOx ozone season allowances from prior compliance periods. *Id.* Under the Final Rule, EPA will "confiscate an 'excess' banked allowances on a prorated basis beyond the assurance cap of 21% starting from 2024 through 2029." *Id.* After 2029, EPA will lower the bank cap to 10.5%. *Id.* In other terms, allowances will be few and far between, particularly with a small trading pool, which will put the Ohio Utilities in a position to choose between steep penalties, changing their operations, or shutting down.

Every state involved in the Good Neighbor Plan is critical to the implementation

of the trading program. The judicial stays of the disapprovals of the SIPs of several states removes a critical number of states from a plan **reliant** on the simultaneous regulation of **all** 23 states. The trading program is especially critically because the FIP's allowance program punishes lower NOx emissions by reducing the number of allowances if a unit has a lower season-long emission rate. To compensate for the reduced allowances, in high-demand seasons, Buckeye and OVEC will have to find and purchase replacement power on an accelerated schedule and, now, a smaller market. Decl. of Thomas Alban at ¶ 22 (Attached as Exhibit C).

The Good Neighbor Plan's requirements for "immediated implementation" would also leave Buckeye with little time "to develop power supply plans and environmental compliance plans to meet the new rule." *Id.* at ¶ 24. As a result, Ohio consumers will incur "immediate and significant cost increases." *Id.* Even more concerning, the Final Rule will have an immediate impact on reliability because it requires facilities "to either reduce their output or retire the assets early." *Id.* at ¶ 25. Units previously called on for "reliability (i.e. to prevent blackouts on the electric grid)" are likely going to be subject to punitive penalities because the Good Neighbor Plan "provides no relief of allowance penalties for emergency situations." *Id.* at ¶ 26.

### C.    Other interested parties would not suffer harm by temporarily staying the rule.

Staying the Final Rule would not cause any harm to the public or EPA. Even if effective, the Good Neighbor Plan would only result in minimal environmental benefits

in the first years of implementation.  Moreover, with the SIP disapprovals stayed in several states, the FIP will not significantly change national emissions, which are already declining due to the robust ozone emissions controls and regulations currently in place.

### D.    A stay is in the public interest.

Without a stay of the Good Neighbor Plan, the Ohio Utilities will incur substantial costs for no demonstrable benefit to the general public or the environment. If the Final Rule is implemented, the Ohio Utilities, ratepayers, and customers will bear the burden of additional costs and outages resulting from the reductions imposed by the Final Rule.  Specifically, Ohio consumers will incur "immediate and significant cost increases."  Decl. of Thomas Alban at ¶ 24.  The public also has an interest in ensuring the relationship between federal and state environmental protection agencies is not diminished by overreaching federal actions.  Lastly, there is a general public interest in avoiding unnecessary disruption in regulation posed by the accelerated schedule for a Final Rule that is likely to be remanded or vacated.

## CONCLUSION

Seeking to implement the Final Rule under such circumstances would be arbitrary and capricious.  Conversely, staying the Final Rule will preserve the productive capacity of the American industry and will help to ensure the availability of reliable and affordable electricity during the summer months.  For the foregoing reasons, Buckeye and OVEC request this Court stay EPAs Good Neighbor Plan pending completion of judicial review.

Dated: August 4, 2023

Respectfully submitted,

_____

Michael E. Born
Cheri A. Budzynski
Krystina E. Garabis
Shumaker, Loop & Kendrick, LLP
Huntington Center
41 South High Street
Suite 2400
Columbus, OH 43215
(614) 463-9441
mborn@shumaker.com
cbudzynski@shumaker.com
kgarabis@shumaker.com
*Counsel for Petitioners Buckeye Power, Inc. and the Ohio Valley Electric Corporation*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the requirements of Fed. R. App. P. 27(d)(2)(A) because it contains 3,685 words according to the count of Microsoft Word, excluding the parts of the motion exempted by Fed. R. App. P. 32(f), and therefore is within the word limit of 5,200 words. I further certify that this motion complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a proportionally-spaced font, and is double-spaced, except for headings, block quotes, and footnotes.

Dated: August 4, 2023

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 15(c), Fed. R. App. P. 25, and 40 CFR 23.12(a), on this date, I hereby certify that a true copy of the foregoing Petition for Review and Disclosure Statement was served via certified mail to the following:

Hon. Michael S. Regan
Office of the Administrator (1101A)
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Hon. Merrick B. Garland
Attorney General for the United States United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Office of General Counsel (2310A)
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

_____
Michael E. Born
*An Attorney for Petitioners Buckeye Power, Inc. and*
*the Ohio Valley Electric Corporation*

Exhibit A

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|                      | 100 EAST FIFTH STREET, ROOM 540          |                         |
| -------------------- | ---------------------------------------- | ----------------------- |
| Deborah S. Hunt      | POTTER STEWART U.S. COURTHOUSE           | Tel. (513) 564-7000     |
| Clerk                | CINCINNATI, OHIO 45202-3988              | www.ca6.uscourts.gov    |

Filed: July 25, 2023


Mr. Matthew Franklin Kuhn
Mr. Joseph Anthony Newberg
Ms. Alexandra L. St. Romain


      Re:  Case No. 23-3216/23-3225, *KY v. EPA, et al*
           Originating Case No. EPA-R04-OAR-2021-0841 : EPA-HQ-OAR-2021-0663

Dear Counsel,

    The Court issued the enclosed Order today in this case.


                Sincerely yours,


                s/Robin L Baker
                Case Manager
                Direct Dial No. 513-564-7014

cc:  Mr. Jarrod Lee Bentley
     Ms. Elizabeth A. Brody
     Mr. Jeffrey T. Hammons
     Mr. Michael Robert Wajda


Enclosure

Exhibit A

Nos. 23-3216/3225

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

```
┌─────────────────────────────┐
│          FILED              │
│       Jul 25, 2023          │
│  DEBORAH S. HUNT, Clerk     │
└─────────────────────────────┘
```

COMMONWEALTH OF KENTUCKY,            )
                                     )
    Petitioner (No. 23-3216),        )
                                     )
                                     )
KENTUCKY ENERGY AND ENVIRONMENT      )
CABINET,                             )
                                     )
    Petitioner (No. 23-3225),        )        O R D E R
                                     )
v.                                   )
                                     )
UNITED STATES ENVIRONMENTAL          )
PROTECTION AGENCY, et al.,           )
                                     )
    Respondents.                     )

Before: COLE, McKEAGUE, and NALBANDIAN, Circuit Judges.

In these related cases, petitioners the Commonwealth of Kentucky and the Kentucky Energy and Environment Cabinet seek review of an Environmental Protection Agency final action partially disapproving Kentucky's state implementation plan ("SIP") for failing to meet certain requirements of the Clean Air Act ("CAA"). Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9336 (Feb. 13, 2022) (the "Final Rule"). The Environmental Protection Agency and its Administrator, Michael S. Regan (collectively, "EPA") move to transfer the actions to the United States Court of

Nos. 23-3216/3225
-2-

Appeals for the District of Columbia Circuit pursuant to the CAA's venue provision, 42 U.S.C.

§ 7607(b)(1), or, in the alternative, to dismiss for improper venue.  Petitioners oppose transfer, and

EPA replies.  Petitioners move to stay enforcement of EPA's denial of Kentucky's SIP pending

our review.  EPA opposes a stay, and Petitioners reply.  In addition, the States of New York,

Connecticut, Delaware, Maryland, New Jersey, the Commonwealth of Massachusetts, and the

District of Columbia move to file an amicus brief in support of EPA and in opposition to a stay

and have tendered their brief.

In all, we have three motions here: (1) the motion to transfer venue; (2) the motion to stay

enforcement pending appeal; and (3) the motion to file an amicus brief.  We address each in turn.

**I.**

First, the motion to transfer.  Venue for judicial review of challenges to the CAA is

governed by 42 U.S.C. § 7607(b)(1), which provides, in pertinent part, that review of "nationally

applicable regulations promulgated, or final action taken, by the [EPA] Administrator under this

chapter may be filed only in the [D.C. Circuit]."  However, "[a] petition for review of the

Administrator's action in approving or promulgating any [SIP] . . . or any other final action of the

Administrator under this chapter (including any denial or disapproval . . . under subchapter I)

which is locally or regionally applicable may be filed only in the . . . appropriate circuit."  *Id.*  An

exception to this rule is that a locally or regionally applicable final action "may be filed only in the

[D.C. Circuit] if such action is based on a determination of nationwide scope or effect and if in

taking such action the Administrator finds and publishes that such action is based on such a

determination."  *Id.*

EPA argues that the Final Rule is nationally applicable or, alternatively, that it is based on

a determination of nationwide scope or effect; Petitioners disagree.  We do not defer to an agency's

interpretation of a venue statute.  *See Smith v. Aegon Cos. Pension Plan*, 769 F.3d 922, 928 (6th Cir. 2014) ("[T]he Secretary is no more expert than this Court is in determining whether a statute proscribes venue selection.").  There is some debate as to whether a rule disapproving multiple states' SIPs is regionally or nationally applicable.   While the approval of SIPs is prototypically local or regional, *see Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 455 (D.C. Cir. 2013), there is no default rule for the *disapproval* of a SIP.   The text of § 7607(b)(1) says that "any other final action of the Administrator under this chapter (including any denial or disapproval [of a SIP]) which is locally or regionally applicable" must be filed "in the United States Court of Appeals for the appropriate circuit."  42 U.S.C. § 7607(b)(1); *see generally id.* § 7410 (governing SIPs for "national primary and secondary ambient air quality standards").   In making that assessment, we, not EPA, "determine[] both the scope of an action's applicability and whether it was based on a determination of nationwide scope or effect," *State v. EPA*, 983 F.3d 826, 833 (5th Cir. 2020); that determination is made de novo, *Texas v. EPA*, 829 F.3d 405, 421 (5th Cir. 2016).

What's important here is determining *what* "final action" we are dealing with.  42 U.S.C. § 7607(b)(1); *see Texas v. EPA*, No. 23-60069, slip op. at *7 (5th Cir. Feb. 14, 2023) (order) (determining preliminarily what relevant "final action taken by the agency [] the petitioner seeks to prevent or overturn" (quoting *Texas*, 829 F.3d at 419)).

Under the CAA—the applicable statute granting EPA's authority over the challenged action here (the SIP denial)—implementing National Ambient Air Quality Standards ("NAAQS") requires three distinct steps.  First, EPA promulgates or revises NAAQS.  *See* 42 U.S.C. § 7409(b)(1).  Second, the states submit SIPs that implement those NAAQS.  *See id.* § 7410(a).  And third, EPA approves or disapproves each SIP.  *See id.* § 7410(k)(1)–(3).

Kentucky challenges the final step:  EPA's disapproval of each state's SIP.  *See id.*
§ 7410(k)(1)–(3) (specifying how EPA will work with each "State" individually to approve a SIP).
EPA, under § 7410(k)(3), separately considered and disapproved Kentucky's SIP because it
believed that the state did not comply with the CAA's good neighbor provision.  True, the Final
Rule packaged Kentucky's disapproval with other states.  *See* Final Rule, 88 Fed. Reg. 9,336.  But
that doesn't matter because "[w]hat controls is the CAA," "[a]nd the CAA is very clear:  The
relevant unit of administrative action here is EPA's individual SIP denials."  *Texas*, No. 23-60069,
at *9.  That "final action"—EPA's denial of *Kentucky's* SIP—is what we review.  42 U.S.C.
§ 7607(b)(1).  With that, we turn to § 7607(b)(1)'s analysis in two steps.

### A.

To start, we determine whether EPA's SIP disapproval was "nationally applicable" or
"locally or regionally applicable."  *Id.*  That question "turns on the legal impact" of the SIP
disapproval and focuses on the "location" of the state or entity that the final action regulates.
*Texas*, 829 F.3d at 419 (citation omitted).  When a final rule, by its terms, regulates in a single
judicial district, the action is not nationally applicable.  *See Sierra Club v. EPA*, 926 F.3d 844, 849
(D.C. Cir. 2019) (finding an action "not nationally applicable" when it involved a "petition for
objection to a single permit for a single plant located in a single state"); *Dalton Trucking, Inc. v.
EPA*, 808 F.3d 875, 881 (D.C. Cir. 2015) at 881 (finding agency rules that, on their face, "regulate
only nonroad engines and vehicles that are owned or operated *in* [one state]" were not nationally
applicable); *Texas*, 706 F. App'x at 163; *see W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 807 (9th
Cir. 1980) (rejecting that promulgations affecting one state were "nationwide in scope or effect"
because "[t]hey apply locally, not nationally").

Nos. 23-3216/3225
-5-

As far as "the location of the persons or enterprises that the action[s] regulate[]," *Texas v. EPA*, No. 10-60961, 2011 WL 710598, at *3 (5th Cir. Feb. 24, 2011), here, the "legal impact" is local or regional, *Texas*, 829 F.3d at 419. Just as "most . . . approvals of SIPs or SIP revisions . . . unequivocally fall in the 'locally or regionally applicable' category," *Am. Rd. & Transp. Builders Ass'n*, 705 F.3d at 456, so too does the disapproval of SIPs. That's because the State Implementation Plans, by their very nature, concern each State's plan. *See* 42 U.S.C. § 7410(k)(1)–(3). Because the denial and legal impact of Kentucky's SIP affects only Kentucky— that is, it does not concern the nation, let alone any other state—the final action is "locally or regionally applicable." 42 U.S.C. § 7607(b)(1).

## B.

We next turn to § 7607(b)(1)'s exception. Even if the agency's action is local or regional, the challenge "may be filed only in" the D.C. Circuit if the EPA can show two conditions. *Id.* EPA must show that the local or regional "final action" here (EPA's disapproval of Kentucky's SIP) is both (1) "based on a determination of nationwide scope or effect" and (2) properly published. 42 U.S.C. § 7607(b)(1). If the answer to either condition is no, we keep the case here. *Texas*, 829 F.3d at 421. Because EPA cannot meet the first condition, we need not consider the second.

Whether the determination is of nationwide scope or effect is a "context-specific question," *Texas v. EPA*, 706 F. App'x 159, 165 (5th Cir. 2017), which requires us to look at "EPA's factual conclusions or expertise" underlying the determination. *Texas*, 829 F.3d at 422. In proving that condition, EPA faces a "steep hurdle." *Texas*, No. 23-60069, at *11. That's because SIP disapprovals are usually "highly fact-bound and particular to the individual state." *Texas*, 829 F.3d at 421 n.24. And so it is here.

Nos. 23-3216/3225
-6-

The Final Rule states that it reviewed approaches (like those that EPA believed to vary from its nationally uniform framework) "in light of the facts and circumstances of *each particular state's* submission." Final Rule, 88 Fed. Reg. at 9340 (emphasis added); *id.* at 9354 ("[T]he contents of each individual state's submission were evaluated on their own merits."). So EPA's disapproval here was based "on a number of intensely factual determinations" unique to Kentucky. *Texas*, 829 F.3d at 421. The detailed reasoning for disapproval is not even contained in the Final Rule; rather, EPA recommends that any questions on "specific SIP submissions" be directed to the Regional Offices which conducted the analysis. Final Rule, 88 Fed. Reg. at 9337. And the reasoning that the Final Rule does provide for *Kentucky*'s SIP denial is "based on a determination" involving Kentucky and Kentucky alone. *See, e.g.*, *id.* at 9356 ("*Kentucky* is projected to be linked above 1 percent of the NAAQS[.]" (emphasis added); *id.* ("*Kentucky* is linked above 1 ppb to a violating-monitor receptor." (emphasis added).) These "intensely factual determinations" do not have nationwide scope or effect because they all relate "to the particularities of the emissions sources in" Kentucky—not in any other state. *Texas*, 829 F.3d at 421.

Because Kentucky's SIP denial was based on a determination of local scope or effect, EPA fails to rebut the "default presumption of § 7607(b)(1)," which "requires" that this Circuit review locally or regionally applicable actions. *Id.* at 424. Thus, we agree with other circuits to have considered this issue that transfer is not warranted. *See Texas*, No. 23-60069, at *2; *Arkansas v. EPA*, No. 23-1320 (8th Cir. Feb. 16, 2023).

## II.

We next address the motion to stay enforcement pending appeal. We consider four factors in determining whether to issue a stay pending appeal: (1) "whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits"; (2) the likelihood the "applicant will

be irreparably injured absent a stay"; (3) "whether issuance of the stay will substantially injure" other interested parties; and (4) "where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The first two factors "are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

First, Petitioners must show a strong likelihood of success on their claim that EPA acted arbitrarily, capriciously, or unlawfully. *Hilton*, 481 U.S. at 776; *see Maryland v. EPA*, 958 F.3d 1185, 1196 (D.C. Cir. 2020) (per curiam) ("[Courts] apply the same standard of review under the [CAA] as [they] do under the Administrative Procedure Act.") (quoting *Allied Loc. & Reg'l Mfrs. Caucus v. U.S. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000)). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While the standard is deferential, the court must still assess "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

At this juncture, we conclude that Kentucky has made a strong showing that it is likely to succeed on its arbitrary-and-capricious claim because EPA based its disapproval of Kentucky's SIP in part on modeling data and policy changes developed after Kentucky had submitted it. EPA may have valid policy reasons for continuing to evaluate upwind contribution at the one percent of its ambient air quality threshold; nevertheless, "[t]he reasoned agency decisionmaking that the [CAA] demands does not allow the EPA to keep moving the finish line." *New York v. EPA*, 964

F.3d 1214, 1223 (D.C. Cir. 2020) (citation omitted). And "agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (alteration in original) (quoting *Gates & Fox Co. v. Occupational Safety & Health Rev. Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986)). In fact, EPA has stated in the past that, "[i]n general, [it] has not required changes to submitted SIPs that result from changes in factors and methodologies that occur after the SIP is submitted." Approval and Promulgation of Air Quality Implementation Plans; District of Columbia, Maryland, Virginia, 68 Fed. Reg. 19106, 19120 (Apr. 17, 2003). But that is precisely what it appears to have done here, with both the modeling data and the contribution threshold, and Petitioners are likely to show that such conduct was arbitrary and capricious.

Petitioners also argue that EPA exceeded its authority under the CAA by failing to act on Kentucky's SIP submission within the statutory eighteen-month window and by abandoning its purely ministerial role in approving or disapproving states' SIPs. The Fifth Circuit found that the states were likely to succeed on the latter argument. *See Texas*, 23-60069, at *14–17. Given that Petitioners have shown a likelihood of success on their arbitrary and capricious arguments, we do not address those other arguments.

Petitioners argue that they face irreparable harm absent a stay. And we are persuaded by their "irreparable injury" claims. We have held that "invasions of state sovereignty . . . likely cannot be economically quantified, and thus cannot be monetarily redressed," and as such constitute irreparable harm. *Kentucky v. Biden*, 23 F.4th 585, 611–12 n.19 (6th Cir. 2022) ("*Biden I*"); *see also Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) (order) (collecting cases where loss of state sovereignty was deemed irreparable harm). Petitioners are also likely to establish that Kentucky faces irreparable injury due to unrecoverable compliance costs, which it

faces immediately.  *See Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir 2023).  Finally, Petitioners provide evidence that Kentucky residents will face higher prices and that Kentucky's power grid faces destabilization.  *See Texas*, 829 F.3d at 434 ("[P]lant closures [and] the threat of grid instability and potential brownouts alone constitute irreparable injury."); *see also Biden I*, 23 F.4th at 599 ("[S]tates also have a recognized quasi-sovereign interest in the health and economic well-being of their populaces.") (cleaned up).  While EPA provides compelling evidence that such alleged harm may ultimately be minimal, the threats to state sovereignty and the loss of unrecoverable compliance costs weigh in favor of granting a stay.

The final two factors "merge when the Government is the opposing party."  *Nken*, 556 U.S. at 435.  We find Petitioners' assertions weightier.  A stay will not harm EPA because Kentucky's SIP established that it complies with the CAA's good neighbor provision based on a standard EPA endorsed.  Further, EPA itself delayed disapproving Kentucky's SIP.

### III.

Lastly, we grant the motion to file an amicus brief.  Federal Rule of Appellate Procedure 29 permits filing an amicus brief, if granted leave, "during a court's initial consideration of a case on the merits." Fed. R. App. P. 29(a)(1).  The amici here have stated their interests, explained why their brief is desirable and relevant, and its filing will not result in the disqualification of any judge on this panel.  *See* Fed. R. App. P. 29(a)(2), (3).

### IV.

Accordingly, the motions to transfer are **DENIED**, the motions to stay are **GRANTED**, and the motions to file amicus briefs are **GRANTED**.

Nos. 23-3216/3225
-10-

COLE, Circuit Judge, dissenting.  Because the EPA action in question is "based on a determination of nationwide scope or effect," I would transfer this case—including the motions to stay—to the D.C. Circuit.  Therefore, I respectfully dissent.

## I. ANALYSIS

### A. Motions to Transfer

#### 1. *Scope of the Action*

In a consolidated motion, the EPA seeks to transfer both the Petitioners'—the Commonwealth of Kentucky's (Kentucky) and the Kentucky Energy and Environment Cabinet's (Kentucky Energy)—petitions for review to the D.C. Circuit per the Clean Air Act's venue provision.  (No. 23-3216, Mots. to Transfer, Dkt. 8; No. 23-3225, Mots. to Transfer, Dkt. 4 ("Mots. to Transfer").)  This provision divides challenges to EPA "actions" into three classifications:

1. "Nationally applicable" actions—which must be filed in or transferred to the D.C. Circuit;

2. "Locally or regionally applicable" actions—which must be filed in or transferred to the appropriate regional circuit; and

3. "Locally or regionally applicable" actions that are (a) "based on a determination of nationwide scope or effect" and (b) accompanied by the EPA's published finding to that effect—which must be filed in or transferred to the D.C. Circuit.

42 U.S.C. § 7607(b)(1).  So, nationally applicable actions filed elsewhere must be transferred to the D.C. Circuit, while locally or regionally applicable actions must not, unless they fall into the third classification by having a published basis of nationwide scope or effect.  *Id.*

We first determine what the relevant "action" is for purposes of the Act's venue provision. While the EPA refers to the final rule in its entirety as the action, Petitioners, following the Fifth Circuit, characterizes the action more granularly as "[t]he disapproval of Kentucky's SIP," or state

Exhibit A

Nos. 23-3216/3225
-11-

implementation plan.  Our court does not appear to have answered this question in a factually similar case, so we look to guidance from our sister circuits.

Ascertaining the scope of applicability of an action turns on the "face of [the] rule, rather than practical effect[.]"  *ATK Launch Sys. Inc. v. EPA*, 651 F.3d 1194, 1195 (10th Cir. 2011) (discussing *Nat. Res. Def. Council v. Thomas,* 838 F.2d 1224, 1249 (D.C. Cir. 1988)).  Courts look to "the 'regulations promulgated, or final action taken,' not the nature of the 'petition for review.'"  *RMS of Ga., LLC v. EPA*, 64 F.4th 1368, 1373 (11th Cir. 2023).

Here, the challenged EPA action is the denial of multiple states' SIPs.  Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9336 (Feb. 13, 2022) ("Final SIP Denial").  By its own terms, this final agency action is a final rule regarding "the disapproval of State Implementation Plan (SIP) submissions for 19 states . . . and partial disapproval of elements of the SIP submission for two states[.]"  *Id.* at 9336.  While the nature of the petition for review here is limited to Kentucky, the "scope of the regulation" is much broader, and so limiting the "action" to Kentucky's state-specific challenge is inappropriate.  *Thomas*, 838 F.2d at 1249.

Kentucky's view of the action might be persuasive if the Final SIP Denial were analogous to the action in the main case relied on by the Commonwealth, *American Road & Transportation Builders Association v. EPA*, 705 F.3d 453 (D.C. Cir. 2013).  There, California challenged an EPA final rule disapproving of only one SIP:  California's.  *See* Revisions to the California State Implementation Plan, San Joaquin Valley Unified Air Pollution Control District, 76 Fed. Reg. 26609, 26609 (May 9, 2011) ("EPA is finalizing approval of revisions to . . . [one] portion of the California State Implementation Plan (SIP)").  The action, then, was necessarily only one state's SIP denial.

Exhibit A

But this is not the case here.  The Final SIP Denial is more closely aligned with other pollution- or good neighbor-related EPA actions that used a common methodology applied to various states, which were viewed as aggregate actions as opposed to actions by individual states. *See, e.g.*, *ATK Launch Sys.*, 651 F.3d at 1200 (transferring to D.C. a challenge to the inclusion of two counties in an action designating portions of 18 states as failing to comply with a quality standard because the action employed a single uniform regulatory approach across many states nationwide); *S. Ill. Power Coop. v. EPA*, 863 F.3d 666, 671 (7th Cir. 2017) (transferring to D.C. one entity's challenge to an action "of broad geographic scope containing air quality attainment designations covering 61 geographic areas across 24 states," which was "promulgated pursuant to a common, nationwide analytical method"); *W. Va. Chamber of Comm. v. Browner*, No. 98-1013, 1998 WL 827315, at *6–7 (4th Cir. Dec. 1, 1998) (transferring to D.C. a challenge to an action finding that 22 states' SIPs were inadequate because EPA applied a "common legal interpretation" and common analysis to its decision); *Cedar Falls Utils. v. EPA*, No. 16-4504, ECF Doc. No. 4491884, at 9 (8th Cir. Jan. 19, 2017) (stating that the challenged action is one that applied "a single regulatory interpretation and uniform methodology throughout 37 states and the District of Columbia for determining linkages between upwind emissions and downwind receptors pursuant to the Good Neighbor Provision").

So, I find the "action" in question to be the Final SIP Denial in its entirety.  But as discussed below, even assuming the "action" is the state-specific denial of Kentucky's SIP, the following analysis stands.

### 2. Nationally Versus Locally or Regionally Applicable

I proceed, then, to reviewing the action's—the Final SIP Denial's—scope of applicability. Relevant here are three categories of information.  First, the general four-part interstate transport

test.  Final SIP Denial, 88 Fed. Reg. at 9338.  Second, the specific methodology applied to determine compliance with the 4-part test, which the EPA has iterated over time.  *Id.*  And third, the state-by-state "facts and information, including information from the Agency, available to the state at the time of its submission," which was measured against categories one and two to determine compliance.  *Id.* at 9354.  Importantly, while the "general steps of this framework" (information category one) have continued across multiple agency actions, the framework "allow[s] for some methodological variation, and this can be seen in the evolution of the EPA's analytical process across its prior rulemakings" (information category two).  *Id.* at 9338.

The parties appear to disagree about which of these categories we analyze to answer the applicability question.  The parties' divergence on what the "action" is plays a significant role in this disagreement.  The Petitioners argue that application of the general 4-part test (information category one) to specific states alone does not necessitate the action be considered in the D.C. Circuit, and that the substance of the action—the denial of Kentucky's SIP—is Kentucky-specific. In the Petitioners' view, it is dispositive that the four-part test factored in Kentucky-specific information (information category three), that the regional EPA office was involved, and that Kentucky's SIP "involves facilities and emissions that are located exclusively in the Commonwealth."  (Ky. Opp. to Mots. to Transfer 11–12; Ky. Energy Opp. to Mots. to Transfer 12.)  Kentucky also says that "[t]he judicial-review statute requires that the challenged 'action' be of nationwide scope or effect," not the "bases for disapproving the SIP submissions" (information category two), as the EPA provides.  (Ky. Opp. to Mots. to Transfer 17 (quoting Mots. to Transfer 15 n.8).)  Taking all of this together, the Petitioners assert that the disapproval of Kentucky's SIP is locally or regionally applicable.

Kentucky compares the agency action at hand here to the action in *Motor Vehicle Manufacturers Association, Inc. v. Costle*, 647 F.2d 675 (6th Cir. 1981) (per curiam), where a regulation requiring certain automobile warranties was considered nationally applicable because "it applied nationwide." *Id.* at 677 (relying on *Lubrizol Corp. v. Train*, 547 F.2d 310, 316 (6th Cir. 1976) (discussing the action's "inten[t] to apply uniformly throughout the country" and that "no question of fact or law would vary by region")). Under this view, effectively no agency action that denies any state's SIP would be nationally applicable, as just about any SIP denial would necessarily involve "questions of facts that vary by region" due to the state-specific nature of a SIP.

The EPA, in turn, asserts that the current methodology applied to determine compliance with the four-part framework (information category two) is a national and uniform approach that applies to all states. In applying the state-specific information (category three) to this current methodology, it identified states—including Kentucky—that simply failed to carry their burden in the EPA's comprehensive plan. Because of this, the EPA says, the Final SIP Denial in aggregate is either a nationally applicable action or a locally or regionally applicable action based on a determination of nationwide scope or effect based primarily on its refreshed methodology (information category two). Through this lens, fewer actions would go to the regional circuit. But unlike the Petitioners, the EPA addresses the line-drawing problem directly in its motion, citing to *Thomas*, 838 F.2d at 1249, which rejected an argument that the de facto scope of regulation is controlling for purposes of determining venue under § 7607(b)(1)—an argument almost identical to the Petitioners' argument here.

As the majority states, "[w]hile the approval of SIPs is prototypically local or regional, there is no default rule for the disapproval of a SIP." (Maj. Op. 2–3 (citation omitted) (citing *Am.*

*Rd. & Transp. Builders Ass'n*, 705 F.3d at 455).)  Assuming that the Final SIP Denial is not nationally applicable because it does not "apply" to, in a way that warrants action or requires changes from, the whole "nation," I turn to whether the Final SIP Denial was "based on a determination of nationwide scope or effect[.]"  § 7607(b)(1).

### 3. Based on a Determination of Nationwide Scope or Effect

The line between "nationally applicable" and "based on a determination of nationwide scope or effect" appears analytically thin upon reading the parties' arguments, so I turn to the canons of construction to find space between these two venue classifications.

The surplusage canon is instructive, as it requires that "every word and every provision is to be given effect" and that no provision "should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."  *Delek U.S. Holdings, Inc. v. United States*, 32 F.4th 495, 498 (6th Cir. 2022) (quoting *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019)).  "The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."  *Chicago v. Fulton*, 141 S. Ct. 585, 591 (2021) (quoting *Yates v. United States*, 574 U.S. 528, 543 (2015) (plurality opinion)).  So, this canon commands us to give distinct meaning to each of the Act's three venue classifications.

This is not hard to do.  This question is not about the scope of the action—that is the prior question on national versus local or regional applicability.  Here, instead, the question is about the basis of the action:  whether, in disapproving at least parts of 21 states' implementation plans, the EPA *relied on* a determination of nationwide scope or effect.  A review of the Final SIP Denial reveals this answer is yes.

Preliminarily, Kentucky argues that the EPA's analysis consolidated the two-part test for the "based on" classification into just the question of whether the EPA published its finding that

the action is based on a determination of nationwide scope or effect.  But the EPA's briefing shows this is not the case:  The EPA asserts that its finding is both reasonable *and* published—addressing both prongs of this test.  So, the EPA used the correct standard.

Applying this standard, the Final SIP Denial was based on a determination of nationwide scope or effect.  In deciding whether the states complied with their good neighbor obligations, the EPA "appl[ied] a uniform legal interpretation and *common, nationwide analytical methods* with respect to the requirements . . . concerning interstate transport of pollution (*i.e.*, 'good neighbor' requirements) to disapprove SIP submissions that fail to satisfy these requirements for the 2015 ozone [standards]."  Final SIP Denial, 88 Fed. Reg. at 9380 (emphasis added).  In a laymen's terms understanding of the four-part interstate transport test, the EPA identified "monitoring sites"— irrespective of state boundaries—and then identified "states that impact those[.]"  *Id.* at 9338.  To identify these monitoring sites, the EPA "rel[ied] on the results from nationwide photochemical grid modeling using a 2016 base year and 2023 projection year as the primary basis for its assessment of air quality conditions and pollution contribution levels[.]"  *Id.* at 9380.  As the EPA itself put it, "[t]he results of the 2016v2 modeling were used by the EPA as part of the Agency's evaluation of state SIP submissions[.]"  *Id.* at 9339.

By intentional design, the EPA did not focus on an individual state's contribution simply based on its existence as an individual state.  Instead, the EPA set national benchmarks for a comprehensive plan that looked beyond state boundaries due to the nature of air quality issues.  For example, the EPA identified contributions by states "to downwind 8-hour ozone nonattainment and maintenance receptors in 2023."  *Id.* at 9353–54.  Finding that individual states were not committed to doing their part in enacting this nationwide plan, such as by measuring their impact

on the identified receptors by nature of being downwind, the EPA rejected their SIPs and explained

why.  The Final SIP Denial is, then, "based on a determination of nationwide scope or effect."

This conclusion remains true even if the "action" is the Petitioners' or the Fifth Circuit's

view of the "action" (an individual state implementation plan denial as challenged by a given

state), because either action is "*based on* a determination of nationwide scope or effect[.]" § 7607

(b)(1) (emphasis added).  The action provides "common, nationwide analytical methods" to ensure

coast-to-coast dedication to inter- and intrastate clean air.  Final SIP Denial, 88 Fed. Reg. at 9380.

The surplusage canon undercuts Kentucky's argument to the contrary that "[t]he judicial-

review statute requires that the challenged 'action' *be of* nationwide scope or effect."  (Ky. Opp.

to Mots. to Transfer 17 (emphasis added).)  This is simply not what the statute textually instructs.

Instead, the action must be *based on a determination of* nationwide scope or effect.  Interpreting

the nationwide scope or effect provision as requiring the action itself to *be of* nationwide scope or

effect, as Kentucky attempts, would "needlessly" give that provision "an interpretation that causes

it . . . to have no consequence."  *Nielsen*, 139 S. Ct. at 969 (quoting A. Scalia & B. Garner, Reading

Law: The Interpretation of Legal Texts 174 (2012)).  Such an interpretation "makes nonsense of"

the third venue classification:  Asking if an action is of national scope and effect would be "entirely

redundant" to the first classification, which asks if an action is nationally applicable.  *Kungys v.

United States*, 485 U.S. 759, 778 (1988) (plurality opinion).  As the Petitioners' view "would

render superfluous another part of the same statutory scheme," *Fulton*, 141 S. Ct. at 591 (quoting

*Yates*, 574 U.S. at 543), we should reject this view in light of the EPA's view that "give[s] effect"

to "every word and every provision" of the venue classifications, *Delek*, 32 F.4th at 498 (quoting

*Nielsen*, 139 S. Ct. at 969).

That the EPA provided more detailed, individualized evaluations to each state does not alter this reality. To determine if a given state's plan adequately addressed its own role in this nationwide issue, "the contents of each individual state's submission were evaluated on their own merits[.]" Final SIP Denial, 88 Fed. Reg. at 9354. Whether or to what extent the merits of each state's plan were sufficient to comply with its good neighbor obligations was determined *based on* nationwide modeling. Recall the earlier discussion about the line-drawing problems in this type of analysis. Following the Petitioners' argument to its logical conclusion offers no meaningful limiting principle: Even where the agency measures every state in the country against benchmarks derived from boundary-agnostic modeling, announced for the first time in the same final rule, the action would remain in the geographical circuit filed.

I find the Petitioners' argument incompatible with both the "common core of nationwide policy judgments" applied in creating the benchmarks, *id.* at 9380, and the "controlling weight" of the agency's determination, *ABF Freight Sys. Inc. v. NLRB*, 510 U.S. 317, 324 (1994). At all points in its analysis, the EPA had "an eye to ensuring national consistency and avoiding inconsistent or inequitable results" between states. Final SIP Denial, 88 Fed. Reg. at 9381. Recognizing this action as one based on a determination of nationwide scope or effect respects Congress's intent that "the D.C. Circuit . . . review[s] matters on which national uniformity is desirable." *Texas v. EPA*, No. 23-60069, at *4 (5th Cir. May 1, 2023) (internal quotations omitted) (quoting *Texas v. EPA*, No. 10-60961, 2011 WL 710598, at *4 (5th Cir. Feb. 24, 2011)). That multiple circuit courts face the same question about this same final rule across the country is all the more reason to leverage the textual path and send this to the D.C. Circuit. *See, e.g.*, Petition for Review, *Texas v. EPA*, No. 23-60069 (5th Cir. Feb. 14, 2023); Petition for Review, *Arkansas v. EPA*, No. 23-1320 (8th Cir. Feb. 16, 2023); Petition for Review, *Utah v. EPA*, No. 23-9509

(10th Cir. Feb. 13, 2023); Petition for Review, *Pacificorp v. EPA*, No. 23-9512 (10th Cir. Feb. 23, 2023); Petition for Review, *Oklahoma v. EPA*, No. 23-9514 (10th Cir. Mar. 2, 2023); Petition for Review, *Utah Associated Mun. Power Sys. v. EPA*, No. 23-9520 (10th Cir. Mar. 15, 2023); Petition for Review, *Okla. Gas & Elec. Co. v. EPA*, No. 23-9521 (10th Cir. Mar. 16, 2023).

Nor am I moved by Kentucky's protest that it is challenging only the denial of its SIP. In form and function, its challenge is one to the modeling used to deny its SIP, a modeling established to be "nationwide." It is true that the EPA could have issued 21 individual rules. *See* Final SIP Denial, 88 Fed. Reg. at 9380 ("Based on these analyses, the EPA is disapproving SIP submittals . . . for 21 states."). But it did not, because the rule, methodology, and reasoning for the disapprovals remained consistent, just as the EPA's arguments in response to the SIP denial challenges across the country remain consistent. (Mots. to Transfer 8 ("Thus far, petitions for review of the Final [SIP Denial] have also been filed in the Fifth, []Eighth, and Tenth Circuits and EPA has filed, or intends to file, similar motions to transfer to the D.C. Circuit or dismiss those petitions, as well." (footnote omitted)).)

I would therefore grant the motion to transfer to the D.C. Circuit.

## B. Motions to Stay

Having concluded that the D.C. Circuit is the appropriate venue for this case, I move on to consider how, if at all, that decision would impact our jurisdiction to review the Petitioners' motions to say. Venue and jurisdiction are distinct requirements:

> Subject-matter jurisdiction defines a court's "power to adjudicate," while venue specifies "where judicial authority may be exercised" based on "convenience" to the "litigants." The former asks "whether"—whether "the Legislature [has] empowered the court to hear cases of a certain genre?" The latter asks "where"— where should certain kinds of cases proceed?

*Brentwood at Hobart v. NLRB*, 675 F.3d 999, 1002 (6th Cir. 2012) (alteration in original) (citations omitted).   As geographic limitations, the Clean Air Act's venue provision asks the "where question." *Id.* (citing *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006)).   We have held that "the issue of venue is not a jurisdictional issue," so "improper venue may be waived." *Williams v. United States*, 582 F.2d 1039, 1041 (6th Cir. 1978) (finding that, in the criminal context, "venue is likewise a privilege granted to the accused rather than a jurisdictional prerequisite").   And "[i]n considering similar litigation-channeling provisions, the Supreme Court has uniformly treated them as venue, not jurisdictional, limitations." *Brentwood*, 675 F.3d at 1002.

While not jurisdictional, venue can be "inextricably bound up with the remedial decision" of whether a stay should issue.   *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest.*, 760 F.2d 312, 315 (D.C. Cir. 1985) (citation omitted).   The venue provision at issue here focuses less on "classic venue concerns," such as "choosing a convenient forum" so parties "will not be forced to defend an action in a faraway circuit."   *Brentwood*, 675 F.3d at 1002 (citation omitted) (interpreting agency venue provisions).   Instead, § 7607(b)(1) turns purely on the nature of the EPA's final action, vesting the D.C. Circuit with exclusive review of two classifications of final actions.   In so doing, Congress's goal was "to ensure uniformity in decisions concerning issues of more than purely local or regional impact." *Nat. Res. Def. Council v. EPA*, 512 F.2d 1351, 1357 (D.C. Cir. 1975) (Bazelon, J., concurring).

In this way, disposition of the Petitioners' motions to stay depends on whether we grant or deny the EPA's motion to transfer.   If we deny the EPA's motion to transfer (thereby concluding that we are the proper venue for the question), we would review and rule on the merits of the motions to stay—as the majority does.   But if we grant the EPA's motion to transfer, review of the merits of the motions to stay would be inappropriate.   As the D.C. Circuit puts it, where "[a]

number of other motions are also pending, but in view of our decision to grant the transfer, we will leave them for determination by the [circuit to which the petition is transferred]." *Indus. Union Dept., AFL-CIO v. Bingham*, 570 F.2d 965, 968 (D.C. Cir. 1977).

So, as I would grant the motion to transfer, I would transfer the entire case, including the motions to stay, to the D.C. Circuit. *See Tri-Cities Holdings LLC v. Tenn. Health Servs. and Dev. Agency*, 598 F. App'x 404, 407 (6th Cir. 2015) (reviewing orders from one district court after a separate district court had "granted the motion to transfer venue, and did not rule on the substantive motions"); *see also RMS*, 64 F.4th at 1375 (transferring entire challenge to the D.C. Circuit, including a pending motion to intervene). Passing the baton to the D.C. Circuit to review all the challenges to the Final SIP Denial ensures that the proper circuit is deciding all substantive motions aside from the original motion to transfer. In a case like this—rejecting SIPs from 21 states throughout eight of the ten EPA regions and ten federal judicial circuits, *see* Final SIP Denial, 88 Fed. Reg. at 9380—we should seek to carry out the intent of "centraliz[ing] review of national SIP issues" as opposed to causing "piecemeal review of national issues in the regional circuits, which risks potentially inconsistent results." *Texas v. EPA*, 2011 WL 710598, at *4.

## II. CONCLUSION

For foregoing reasons, I would transfer the petitions for review—and the motions to stay—to the D.C. Circuit, so I respectfully dissent.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk

Exhibit B

## D. C. CIRCUIT

## UNITED STATES COURT OF APPEALS

---

**OHIO VALLEY ELECTRIC CORPORATION (OVEC)**

*Petitioner,*

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,**

*Respondents.*

---

DECLARATION SUPPORTING MOTION TO STAY THE FINAL "GOOD NEIGHBOR"
OZONE SEASON TRANSPORT RULE ISSUED BY THE U.S. ENVIRONMENTAL
PROTECTION AGENCY

Exhibit B

## DECLARATION OF J. MICHAEL BROWN

1. I am the Environmental Safety and Health Director for the Ohio Valley Electric Corporation (OVEC), including its wholly-owned subsidiary, the Indiana-Kentucky Electric Corporation (IKEC).[1] I am responsible for directing corporate environmental permitting and compliance activities, corporate safety policies and procedures, and certain energy scheduling functions, including the offering of OVEC's generating units into the PJM Market. I also serve as OVEC's Designated Representative (DR) for managing the air emission allowance accounts for each of OVEC's generating stations via USEPA's Clean Air Market Division (CAMD). I provide this declaration in support of OVEC's and Buckeye Power, Inc.'s motion to stay the Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 36,654 published in the Federal Register on June 5, 2023 (Federal Plan), while legal proceedings associated with this rulemaking are ongoing.

2. This declaration is based on my personal knowledge of facts and analysis conducted by my staff.

3. I have been responsible for overseeing OVEC's environmental compliance activities since 2011. During my time at OVEC, I have been responsible for directing OVEC's overall corporate environmental safety and health compliance, including environmental compliance at OVEC's two coal-fired generating stations located in Madison, Indiana and Cheshire, Ohio.

4. My utility career spans over 32 years all in the field of environmental compliance.

5. I graduated with a Bachelor of Science degree from Penn State University and earned a Master of Business Administration from Capital University.

6. I am submitting this declaration because Good Neighbor Plan finalized by the Environmental Protection Agency (EPA) on June 5, 2023 creates immediate harm to OVEC in the form of compliance obligations that are likely to be moot following the outcome of this litigation and litigation addressing various state implementation plans (or SIP) disapproval appeals where "stays" of the disapproval of those plans have been granted. Over a dozen challenges to the Federal Plan are pending in various circuit courts. Ten states currently have been granted a judicial stay of their SIP disapproval. *See, e.g., Kentucky v. EPA*, No. 23-3216, Doc. 89, Order (6th Cir. July 25, 2023) (staying the disapproval of Kentucky's SIP). As further explained in this declaration, EPA's Federal Plan will harm OVEC, particularly at its Kyger Creek Station, in Cheshire, Ohio. These court opinions indicate that EPA's entire Good Neighbor Rule is likely to be found unlawful.

## OVEC OPERATIONS

7. OVEC employs approximately 509 full-time employees in Southern Ohio and Southeast Indiana. OVEC owns and operate the 5-unit 1086 MW Kyger Creek Station, in Cheshire,

---

[1] As used herein, the term "OVEC" refers to the combined OVEC and IKEC business.

Ohio, and the 6-unit 1303 MW Clifty Creek Station in Madison, Indiana. Power from these stations is ultimately provided to our utility owners or their utility affiliates under the terms of a long-term power contract (each counterparty to this power contact, an OVEC Sponsor), for their use in meeting the electricity needs of their residential, commercial, industrial and wholesale customers.

8. The end users of most of the electricity in the OVEC Sponsors' service territory live in rural areas with some of the lowest economic demographics in the United States. OVEC's baseload electric generation resources power the region and Ohio, and that baseload generation sustains the grid with reliable access to energy. A balanced generation mix is essential to maintaining a safe and reliable grid.

## ADDITIONAL CONTROL REQUIREMENTS UNDER EPA'S FEDERAL PLAN

9. EPA's Federal Plan imposes stringent nitrogen oxide (NOx) emission reduction requirements on electrical generating units (EGUs) in 22 covered states during the ozone season (May 1 - September 30 annually).

10. States covered by this Federal Plan include Ohio.

11. Starting in 2023, EGUs in Ohio will be required to comply with a more restrictive NOx emissions trading program. This is based on a state-wide emissions budget set by EPA that includes new daily emission rates that go into effect on the common stacks at Kyger Creek beginning in 2024, and declining NOx ozone season budgets over time based on a combination of heat input calculations, as well as on the level of overall reductions EPA has determined is achievable through particular emissions controls. The Federal Plan also includes aggressive restrictions on the size of the allowance banks that provide a disincentive for both near-term and longer-term allowance trading and new forms of penalties and other enforcement provisions.

12. By 2027, the Federal Plan requires a 50% reduction from 2021 ozone season NOx emissions levels. See Final Good Neighbor Plan Fact Sheet.[2]

13. The Federal Plan effectively diminishes the fossil fuel generation capacity by ratcheting down EPA's NOx allowance allocations to the states, which flows down to reduced allocations to utilities, such as OVEC.

14. The Federal Plan will dramatically alter OVEC's business practices to adapt to the new trading program. When appropriate, OVEC has used its best business judgment and experience complying with similar federal trading programs to bank unused NOx ozone season allowances from prior compliance periods. Thus, OVEC has made strategic purchases of additional allowances under prior rules as a risk-management hedge for future compliance periods. However, EPA's Federal Plan "enhancements" put a significant portion of those banked allowances at risk of confiscation due to EPA's plans to limit the size of the future allowance bank. EPA intends to confiscate any "excess" banked allowances on a prorated basis beyond the assurance level cap of 21% starting

---

[2]https://www.epa.gov/system/files/documents/2023-30/Final%20Good%20Neighbor%20Rule%20Fact%20Sheet_0.pdf

each year from 2024 through 2029. EPA will then lower that bank cap to only 10.5% of the assurance level beginning in 2030 and beyond. In addition, nearly half of the total allowance pool from the states covered by the Federal Plan will be unavailable due to the court-issued stays of interstate transport SIP disapprovals. OVEC is unsure how EPA could implement their plans to confiscate "excess" banked allowance on the sources in the remaining states while legal appeals for the states subject to the stays proceed.

15.    Due to these legal issues and other concerns about long-term allowance availability and pricing, OVEC can no longer rely on a viable allowance trading market to turn to if it finds it necessary to make allowance purchases to meet future compliance obligations.

16.    Utilities, including OVEC, must immediately (in 2023) decide whether to undertake NOx control upgrade projects for specific units for which the Federal Plan dictates the installation of controls by 2026-2027.

17.    The Federal Plan sets an aggressive compliance timeframe difficult to implement in the time period set by EPA. New state and unit-level NOx allocations begin in the 2023 ozone season, leaving virtually no time for regional transmission organizations (RTOs) and generators to plan for and execute new 2023 summertime operational constraints and dispatch changes. The lack of adequate time to react to the new requirements of the Federal Plan could place the reliability of the bulk power grid in jeopardy.

18.    Moreover, utilities must make immediate decisions about whether or not to reset power supply obligations with RTOs for the 2024 ozone season and future years.

19.    Likewise, there is no reliability "safety valve" to address reliability concerns, which generators, including OVEC, as well as several RTOs urged EPA to incorporate in public comments.

20.    RTOs and power generators have no time to devise a diligent plan for 2023-2024 and future years to ensure compliance while securing grid reliability and public safety.

## **IMPACTS BEYOND 2023**

21.    Under the Federal Plan, OVEC will be required to sacrifice hard-earned allowances obtained by making early NOx reductions. This means that OVEC's prudent decisions to reduce NOx emissions and bank allowances in prior years will result in punishment via "excess" allowance confiscation.

22.    The Federal Plan also creates uncertainty for OVEC and other utilities because it does not provide unit-specific allocation forecasts for 2026 and beyond. Instead, the Federal Plan requires increasingly stringent state/utility NOx budgets based on each year's unit operating heat input.

23.    The lack of specific allowance allocations combined with increasingly stringent statewide budgets will create confusion in future years. Fewer allowances must be allocated across a statewide fleet without regard to the unique operating profiles of individual units.

24.     OVEC's coal fleet will have even fewer unit-level allocations beginning in 2030 and beyond. The Federal Plan does not provide pre-set budget floors for those years and instead will apply dynamic budgeting to further limit the number of available allowances based on prior year heat input.

25.     The Federal Plan also will recalibrate banked allowances to further tighten allowable emissions. OVEC and other generators may only keep a maximum of 10.5% of the sum of the state emission budgets in 2030 and beyond.

26.     The Federal Plan does not give utilities adequate time to build replacement generation for retiring coal-fired assets, which is crucial to maintain reliability.

## **CONCLUSION**

27.     The Federal Plan will require significant expenditures to install emission controls, and result in the curtailment of generation at OVEC units and, possibly, the early closure of OVEC facilities.

28.     This irreparably and immediately harms OVEC, its owners, and our owner's utility customers (including retail customers) by placing immediate restrictions on unit operations during the ozone season due to EPA's unique treatment of units sharing a common stack under this rule.

29.     For the reasons described above, OVEC, The OVEC Sponsors, and potentially their utility customers are facing substantial harm during the next 12-18 months from the implementation of this Federal Plan.


I, J. Michael Brown, declare under penalty of perjury that the foregoing is true and correct. Executed this first day of August, 2023.


*J. Michael Brown*

J. Michael Brown

## Declaration of Harm

1. My name is Thomas Alban, Vice President of Generation for Buckeye Power, Inc. ("Buckeye"). I have worked at Buckeye for 19 years. I am currently responsible for power generation and all supporting functions at Buckeye's generating facilities. I am also the Designated Representative for managing emissions allowance accounts for Buckeye's generating facilities.

2. This Declaration of Harm is based on my personal knowledge and experience, formed after reasonable inquiry and due diligence.

### Buckeye Power, Inc.

3. Buckeye is an Ohio nonprofit corporation operating on a cooperative basis. Buckeye is owned and governed by its twenty-five member-owners, which includes all of the electric distribution cooperatives engaged in the sale of electricity within the state of Ohio.

4. Buckeye provides wholesale electric service to its members, who in turn distribute electricity to their retail, end use consumers.

5. The retail service area of Buckeye's members covers a substantial part of the land area of the state of Ohio and extends into portions of 77 of Ohio's 88 counties.

6. Buckeye's members currently serve approximately 400,000 consumers, around 91 percent of whom are classified as residential (farm and non-farm), while the remaining 9 percent are classified as commercial, industrial, or other.

7. Buckeye owns and operates Units 1, 2, and 3 at Cardinal Plant located near Brilliant, Ohio, with nominal generating capacities of 600 MW, 600 MW and 630 MW, respectively. Buckeye purchased Unit 1 from AEP Generation Resources Inc. in August 2022. Cardinal is a baseload, coal-fired electric generating facility.

8. Buckeye owns and operates the Greenville Station located near Greenville, Ohio, with a nominal generating capacity of 200 MW. The Greenville Station is a natural gas-fired peaking generating facility. It consists of four units of 50 MW each.

9. Buckeye owns and operates the Robert P. Mone Station located near Convoy, Ohio, with a nominal generating capacity of 510 MW. The Mone Station is a natural gas-fired peaking generating facility. It consists of three units of 170 MW each.

10. Buckeye's wholly-owned subsidiary, Buckeye Power Generating, LLC ("BPG"), owns an 18 percent interest in the Ohio Valley Electric Corporation ("OVEC") and has the right to 18 percent of the output of OVEC's two base-load, coal-fired electric generating facilities, the Kyger Creek and Clifty Creek facilities. Buckeye has the right to BPG's entitlement to the output of the Kyger Creek and Clifty Creek facilities.

11. Buckeye's generation assets provide critical support to the reliable operation of the electric grid.

Exhibit C

12. Buckeye is fully committed to environmental stewardship. In recent years, Buckeye has spent nearly $1 billion installing state of the art, high-performing selective catalytic reduction ("SCR") and jet bubbling reactor flue gas desulfurization ("JBR FGD") equipment on its coal-fired units at Cardinal. In 2003, SCR equipment was placed in commercial operation on Units 2 and 3 at a total capital cost of approximately $185 million. In 2008, construction of JBR FGD equipment was completed and placed into service on Unit 2. The capital cost of the equipment was approximately $266 million. In 2012, JBR FGD equipment was installed on Unit 3 at a capital cost of approximately $489 million. These recent capital investments represent approximately 50 percent of Buckeye's total investment at Cardinal Plant to date.

13. Buckeye Power has also spent significant time and money ensuring compliance with Mercury Air Toxics Standards ("MATS") requirements.

14. The Environmental Protection Agency's ("EPA") Federal Implementation Plan ("FIP") for the 2015 Ozone National Ambient Air Quality Standard ("NAAQS") will irreparably harm and cause injury to Buckeye, its investments, its 25 member-owners, and the 400,000 consumers they serve in the state of Ohio.

<u>Immediate Impact of FIP on Buckeye</u>

15. Ohio submitted the ozone state implementation plan ("SIP") to the US EPA on September 28, 2018.

16. The US EPA published the final denial of Ohio's SIP on February 22, 2022.

17. The US EPA's FIP, called the Good Neighbor Plan, was finalized on March 15, 2023, and published on June 5, 2023. The US EPA has stated that the FIP will take effect during the summer of 2023.

18. Stays of SIP disapprovals have been issued by the Fifth, Sixth, Eighth, Ninth and Tenth Circuit Courts for the following states: Texas, Louisiana, Mississippi, Kentucky, Arkansas, Missouri, Minnesota, Nevada, Oklahoma, and Utah.

19. In response to some of the judicial stays of SIP disapprovals, on July 31, 2023, US EPA issued an Interim Final Rule. This Interim Rule removes six of the above-mentioned states from the Good Neighbor Plan trading program, and significantly decreases the number of trading options available to the remaining states subject to the FIP. All aspects of the Good Neighbor Plan rulemaking, including modeling, emissions impacts, bank recalibration, and dynamic budgeting, were developed assuming participation from all 23 states subject to the FIP.

20. The FIP will have substantial and immediate impacts on the operations of Buckeye's generation fleet and will have substantial and immediate cost and reliability impacts to Buckeye and its members.

21. The Federal rule requires almost immediate reductions in NOx emissions from generating units. A daily backstop of 0.14 lb/mmBtu for NOx will go into effect starting in 2024 for coal-fired units equipped with SCRs. OVEC, of which Buckeye is an owner and relies upon

Exhibit C

Exhibit C

to meet its members' generation needs, will be immediately impacted by these reductions. OVEC will have to make significant investments or limit generation output due to the punitive daily emission rate. These impacts to the Clifty Creek Station are further detailed in OVEC's Declaration of Harm.

22. The Good Neighbor Plan also implements a new emissions allowance program with an aggressive timeline that ultimately punishes utilities for emitting lower levels of NOx. If the generating unit has a lower season-long emission rate or a temporary lower capacity factor (i.e., lower output which could be caused by an outage or simply less demand for a limited period), the unit is at risk of receiving a lower number of allowances in the future.

23. Utilities have been able to accumulate allowances over the years by efficient NOx control, purchasing from the market, or banking allowances in times of lower generation output. Beginning immediately with the implementation of the Good Neighbor Plan, the electric generation industry can no longer count on these factors for its operations, as the Good Neighbor Plan allows EPA to confiscate allowances if banks exceed the 21% assurance level cap. The Good Neighbor Plan will thus require immediate changes to generating plant operations.

24. The immediate implementation of the Good Neighbor Plan leaves utilities with very little time to develop power supply plans and environmental compliance plans to meet the new rule. This Rule will result in immediate and significant cost increases that will ultimately be borne by Ohio consumers.

25. The Good Neighbor Plan will also have an immediate impact on reliability, as it will require owners of generation assets that are necessary to maintain stable electric supply, including Buckeye, to either reduce their output or retire the assets early.

26. Units that may be called on for reliability (i.e. to prevent blackouts on the electric grid) will have to take punitive allowance penalties under the Good Neighbor Plan into consideration. On December 23 and 24, 2022, PJM Interconnection, LLC ("PJM") (the regional transmission organization in which Buckeye and all of Ohio operates) experienced significant demand on the electric system. PJM had to take extreme measures to ensure sufficient generation was available to prevent a black out on the grid that could have affected 13 states and the District of Columbia. During this event, PJM instituted a Maximum Generation Action directing generation resources, including Buckeye's resources, to operate above their normal maximum output levels. With many coal plants and other baseload generation already expected to retire, reliability issues will increase and similar situations are expected year-round — including during ozone season (May-September). As allowance quantities significantly decrease over the years, generating units like Buckeye's may be required to run by the applicable regional transmission organization in situations where no allowances are available. Despite the US EPA and US Department of Energy signing a Memorandum of Understanding on March 9, 2023, to help ensure environmental regulations will not impact grid reliability, the Good Neighbor Plan provides no relief of allowance penalties for emergency situations as described above.

Exhibit C

Exhibit C

27. The Good Neighbor Plan will likely force many baseload generation assets to retire and does not give utilities adequate time to assess and build replacement generation. Due to significant rulemakings at the US EPA in addition to this FIP, retirement dates for coal-fired units are being expedited.

28. As electrification increases and a reliable electric grid becomes increasingly critical, the Good Neighbor Plan places grid reliability at immediate risk.

<u>Conclusion</u>

29. The US EPA's FIP, and its selective implementation, during ongoing legal challenges irreparably harms Buckeye, its member cooperatives, and consumers in Ohio.

I, Thomas M. Alban, declare under penalty of perjury that the foregoing is true and correct. Executed on this 2ND day of August 2023.

Thomas M. Alban

4

Exhibit C